THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* FELÍCITO SANTIAGO, Defendant and Appellant.

No. 7971. Argued February 6, 1940.—Decided February 13, 1940.

*Agustín E. Font* for appellant. *R. A. Gómez, Prosecuting Attorney,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

The information in the present case charges Felícito Santiago, appellant herein, with murder in the first degree, committed as follows:

". . . . Felícito Santiago, prior to the filing of this information, that is, on or about the 1st of December, 1936, in the municipal district of Yauco, which is part of the judicial district of Ponce, P. R., and on the occasion of assaulting, with intent to commit rape, Hortensia García, known as Hortensia Lugo, a girl under 14 years of age, who there and then was not the wife of the defendant, wilfully, criminally, and unlawfully killed the said girl Hortensia García known as Hortensia Lugo."

After a trial which lasted two days, the jury brought in a verdict of guilty against the defendant, whereupon the court rendered its judgment sentencing him to imprisonment for life.

The defendant appealed and has assigned in his brief seven errors which he claims were committed by the court: in refusing to transmit to the jury an instruction, as requested,

when the district attorney began his opening statement; in permitting witnesses Arturo Castro and Vicente Piazza to testify without their names being endorsed on the back of the information; in allowing witness Castro to describe the place of the events; in denying a certain motion for the discharge of the jury; in refusing to let him answer certain question put to him while on the stand, and in refusing three instructions submitted in writing.

■ The facts in connection with the first assignment occurred as follows:

As soon as the jury was impaneled, the judge directed the district attorney to proceed with his opening statement, as follows:

"The district attorney may proceed to state his theory of the case to the gentlemen of the jury. . ."

The district attorney said:

"Gentlemen of the jury: you are going to take part on this day in one of the most serious cases committed for many years in the Island of Puerto Rico."

The defendant interposed:

"Your Honor, I am going to request the court to instruct the jury to the effect that the statements of the district attorney should be confined to an exposition of the facts on which he relies for his theory and not to state conclusions to be arrived at by you (the jury) in accordance with the facts, after considering the evidence as a whole and receiving the instructions from the court."

The judge ruled as follows:

"This will be done in the final instructions. The district attorney, however, has only started."

The defendant took exception.

We fail to find anything in the statements from the district attorney at variance with the law and the decisions. His reference was to the crime itself, a serious crime indeed, but not to the defendant. Referring not only to the address by

the district attorney but to the instructions from the judge, this court in *People* v. *Boria,* 12 P.R.R. 166, 171, speaking through the then Associate Justice Hernández, expressed itself as follows:

"The charge of the judge to the jury cannot be described as partial.

"It began as follows:

" 'Gentlemen of the jury, the debate between the parties has concluded, and the horrible crime under investigation is about to be submitted to you for consideration and decision as the only arbiters having the last word.'

"The horrible crime to which the judge refers is that described in the information, and the words transcribed do not contain any opinion as to its existence as related by the *fiscal.* This opinion was left to the consideration and ·decision of the jury, whom the judge recognizes as those called upon to pronounce the final word. The crime is indeed horrible, and the judge in recognizing it to be so did nothing more than to publish a fact which could be deduced from the terms of the information itself, and it cannot be said that he thereby influenced the mind of the jury to find the defendant guilty of the crime with which he was charged.

"We may well apply to this case what this court said through Mr. Justice Figueras in deciding the appeal taken by Felipe Robles in a cause for murder in the first degree, which was decided on April 25 of last year:

" 'As a matter of fact, the prosecution was for a grave crime, involving, as it did, the trial of an act which resulted in depriving a man of his life, and if the judge addressing the jury called atten- tion to this gravity he did nothing more than to publish a truth of which the members of the jury were surely already convinced. It is one thing to recognize the gravity of a case considered by itself in view of its own nature and completely apart from the author of the criminal act, and another to relate that gravity in connection with the defendant, which said charges do not show.' "

The first error assigned was, therefore, without merit. The second and the fourth, which refer to the court per- mitting the testimony of two witnesses whose names were not endorsed on the back of the information, were also without merit.

As far back as 1906 this court, through Mr. Justice MacLeary, in *People* v. *Kent,* 10 P.R.R. 325, 365, expressed itself as follows:

". . . . Under exceptions Nos. 24, 30, 31, 32, the defendant objected to the testimony of the witnesses Peterson, Candina, Morris and Tuzo on the ground that their names had not been presented to the defendant in accordance with law.

"These exceptions are presumably based on section 142 of the Code of Criminal Procedure, which reads as follows:

" 'Section 142.—The arraignment must be made by the prosecuting attorney, which consists in reading the information to the defendant and delivering to him a copy thereof, and of the indorsements thereon, including the list of witnesses, whereupon the court asks him whether he pleads guilty or, not guilty to the information.'

"It was not the intention of this statute to prevent the prosecuting attorney from examining any witness whose name might not be endorsed on the information. A statute similar to ours exists in California, and was construed by the Supreme Court of that State in the following words:

" 'It was not error for the court to permit a witness to be sworn for the prosecution, because his name was not marked on the indictment. It often happens that the necessity for introducing particular witnesses arises on the trial; and justice would be greatly impeded if the rule invoked were affirmed, while no corresponding advantages would accrue from it.' *(The People* v. *Bonney,* 19 Cal. 447.)

"To the same effect are the decisions of the same eminent court in the following cases: *People* v. *Jocelyn,* 29 Cal. 562; *People* v. *López,* 26 Cal. 112; *People* v. *Symonds,* 22 Cal. 348; *People* v. *Fireland,* 6 Cal. 96.

"The introduction and examination of witnesses on a criminal trial are necessarily placed under the control of the trial court and in many instances the judge must use a sound judicial discretion in regulating the same. Unless his discretion has been so used as to prejudice the rights of the defendant or The People, and this is made to appear from the record, his rulings in such matters are not subject to revision (Law of 30th of May, 1904, special session, p. 10)."

It does not appear from a consideration of the facts in the present case that the court abused its. discretion. When the witnesses in question were called to the stand the defend-

ant, through his counsel, confined himself to object thereto on the ground that their names had not been endorsed on the information. He failed to allege surprise, or prejudice, or the need of time to refute in a proper case their testimony.

██ There is no argument on the error assigned. Of course, if witness Castro had been at the place where the crime had been committed, he could describe the same. No such error was committed.

 The fifth error refers to the refusal of the court to discharge the jury. It is assigned as follows:

"Because the court had overruled a motion for the discharge of the jury on the ground that some of the members of the jury had already, by their conduct, formed a judgment adverse to the defendant when the latter had not yet rested and the case had not been submitted to the jury for its final decision, and because, moreover, the presumption of innocence in favor of the defendant even during the deliberations of the jury was infringed. (Pp. 195, 196, 197 and 198 of the transcript of the evidence.)"

A reading of the above pages from the transcript reveals a discussion of the incident in all its details and it may be seen that the motif relied upon by the defendant was the request from one of the jurors to have a witness called to the stand so as to ask him what was the color of the dress worn by the dead girl, after one of the witnesses for the defendant had testified regarding said particular. The ruling of the court speaks for itself and is sustained. It is as follows:

"The motion of the defendant is overruled because in its opinion Mr. Toro, a member of the jury trying this case, is entitled to put any question to the witnesses, and, moreover, because the defendant himself failed to object to the calling to the stand the witness referred to by the defendant to ask a certain question—without knowing of course, the question. The fact that the question referred to some material fact—also thought of and held by the court to be so—does not deprive the juror of his right. The question as to what kind of dress the girl was wearing on that day is very material, precisely, in order to arrive at a fair and reasonable opinion in accordance with the evidence."

In his argument on the sixth assignment the appellant, in his brief, expresses himself as follows:

"The ground for this asignment is that the court refused to let the defendant be examined as to other misterious deaths which had occurred in the house where the dead child lived.

"The theory of the defendant tended to show, not only that the defendant had not committed the facts imputed to him, but that somebody else might have intervened in the death of the said girl. In this respect we tried to show that other girls before had met with their death in the house where the girl was sheltered, and that there were circumstances that might lead to the belief that, for special reasons, the girl had been the victim of the fury of a person other than the defendant.

"During our examination of witness Felícito Santiago (pp. 223 and 222 of the transcript of the evidence) the court refused to let us examine him regarding that particular."

It appears from the transcript that, upon the defendant being called to the stand, and while being examined by his counsel, the following incident took place:

"There, in that house of Francisco Torres, had other girls died?—Yes, two more had died.—Prosecuting attorney: I object, Your Honor. Counsel wants to show that crimes have been committed in the house of Francisco Torres.—Counsel for defendant: I am not mentioning crimes; I am going to prove that two more deaths have occurred in the house of Francisco Torres.—Proscuting attorney: Let us suppose that there have been forty deaths, what has that to do with this case?—Judge: Objection sustained. I fail to see what the death of other people has to do with this one. In every house some people have died.—Defendant: What I want to show is that two more sudden, almost misterious deaths have occurred.—Prosecuting attorney: But who has committed such crimes, supposing they were crimes?—Counsel for defendant: This one has not yet been shown to be a crime.—Prosecuting attorney: Of course, I know it.—Counsel for defendant: The prosecution may know it; I do not know it yet.—Judge: Objection sustained. We are not investigating any other case than the one before us.—Counsel for defendant: We take exception because there has been evidence regarding the death of other little girls there, and it was our purpose to have the jury weigh this fact and form their own judicial conclusions."

No error was committed. No connection appears between those other deaths and that of Hortensia García.

The seventh and last error assigned was also without merit, because the instructions which counsel for the defendant requested the court to transmit to the jury and were refused by the court, were either clearly improper or had already been given in a wide and correct manner by the court to the jury.

This is a case in which counsel for the defendant seemed to have fulfilled his mission to the last and did all in his power to defend the accused, but the proof of the latter's guilt is so strong that no mention thereof is even made in his brief. The instructions from the court to the jury contain such an ample and detailed summary of the evidence for the prosecution and for the defense that we might as well transcribe, in order to have a more perfect idea of the case, at least some of the evidence for the prosecution to which the jury gave credence. It is as follows:

". . . . the prosecuting attorney. . . has introduced oral, expert, documentary and material evidence, the latter consisting of a yagua (royal palm sheathing leaf) produced here which was found by the prosecuting attorney when he visited the place where the facts are alleged to have occurred; also the clothes which the defendant was wearing on the 1st of December, that is, a shirt and trouser, without mentioning the button enclosed in that envelop, which will be handed to you, also found at the place of the events, and which belongs, according to the testimony of some of the witnesses, to one of the sleeves of the shirt worn by the defendant on the day of the events. . .

"The oral evidence. . . tends to show. . . that this defendant, on the 2nd of December, 1936, during the funeral of the Girl Hortensia Lugo, who had died in the afternoon of the day before, called at the home of Miguel Angel Vera for some water, that he was pale and half drunk, according to several witnesses. In regard to this particular of the case the following witnesses have testified: Miguel Angel Vera, Luz María Vera, Justino Vargas—who testified that he was cousin to the defendant—Elena Pérez, Lucila Rodríguez and Santos Rodríguez: six witnesses. While the above women were sewing in that house, Justino Vargas and Miguel Angel Vera

being present, the defendant appeared and asked for water, where-upon he said that he might go to jail on account of the girl who was killed; that nobody had been arrested but that he might go to jail on that score, but that he might perhaps come off well because he had advised certain woman to be careful about what she said so as not to make a blunder. As the result of the above statements, which confidentially reached the police force investigating the death of the girl found in the Quebradas barrio of Yauco, the defendant was arrested.

"Witness Gumersinda Pacheco told you that she was living with Francisco Torres, that is, in the house where Hortensia Lugo lived; that on the 1st of December this girl went out in search of grass for some animals, sows; that the defendants was roaming about; that about 3 p. m. she went out looking for the girl and saw the defendant coming out from some bushes, a patch of coffee trees or something similar, and that the latter told her to be careful about what she might say and not to put her foot into it, as she might suffer for it; that defendant was sort of drunk; that she then saw deep among the bushes on the ground the girl who was dead; that the witness then went home and did not dare to go where she (the girl) was until Francisco Torres arrived, to whom she showed the place and the latter went to fetch the justice of the peace; that prior to that day the defendant had told the girl that she would have to yield to him; that the girl was single and was not the wife of the defendant; that she was about ten or twelve years old. In answer to one of the jurors, when called again to the stand, she said that the girl had on a khaki colored dress and an underskirt.

"Juan Rueda, municipal jailer of Yauco, testified that upon the defendant being taken to the jail, when clothes were brought to him there, he took off the clothes he had on which are these, the same that were identified yesterday.

"Gumersinda Pacheco testified again and recognized these clothes as those worn by the defendant on that day, the 1st.

"The next piece of evidence introduced by the prosecuting attorney was the sworn statement of the defendant which had already been read out to you and I consider it unnecessary to do so again in the course of these instructions, inasmuch as such sworn statement will be submitted to you in full. In said sworn statement the defendant admits having assaulting the girl with intent to have carnal commerce with her, but that he did so at her request.

"Arturo Castro, reporter and correspondent of the newspaper El Mundo here in Ponce, who accompanied the prosecuting attorney

when investigating the case to the place of the events, described to you the place in question and told you that while there the defendant, who was taken there also, admitted that it was on a yagua underneath the palm tree that he had tried to commit such acts upon the child; that she had invited him; that he first refused but that she insisted and he then tried to do it but that he did not do it completely because he realized that he was committing a crime. The witness explained that there were some stones there, that that yagua was there, and that the defendant said that he had left the girl lying down there. On cross-examination Castro stated that the defendant had not admitted having killed the girl, that there were no blood stains on the yagua.

"Vicente Piazza, a prison guard, told you that the defendant himself asked him one day to take him to the prosecuting attorney in his office because he wanted to plead guilty provided he was not sentenced by the judge to more than thirty years in the penitentiary; that he brought him up here to see the prosecuting attorney; that the latter told him that he could not agree to such proposition.

"Then police sergeant Jesús Vargas Rosado and Juan Rueda testified before you regarding the taking of the defendant to the place where the events took place and how this button was found, which the defendant admitted to have belonged to his shirt, but that an aunt or some relative of his had changed the button of the sleeve; that likewise he recognized the spot where he met Gumersinda.

". . . . . . . . .

"Dr. Julio Roca testified regarding the bruises found on the girl when he made the autopsy; she had bruises on her arms and face, blood from the right ear and also on the right eye; that the girl was from ten to twelve years of age; that she showed a hemorrhage from the left side of the head and a fracture of the base of the skull, towards the right side; that she died from internal hemorrhage and fracture of the skull; and that, moreover, she showed bruises on her vulva or lips of her genital organs, but that there was no rape; that is, that the girl had not been raped. The doctor told you also that he spoke to the defendant in his office after the autopsy, and that the latter told him that it was the girl who had asked him to have carnal connection with him several times and that day also, but that he had not done anything to her."

The appeal must be dismissed and the judgment appealed from affirmed.